J-S65027-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: K.J.K., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.L.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1062 MDA 2019 |

Appeal from the Decree Entered, May 30, 2019,
in the Court of Common Pleas of Berks County,
Orphans' Court at No(s):  86415.

| IN RE: E.J.K., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.L.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1063 MDA 2019 |

Appeal from the Decree Entered, May 30, 2019,
in the Court of Common Pleas of Berks County,
Orphans' Court at No(s):  86416.

| IN RE: W.P.J.K., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.L.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1064 MDA 2019 |

Appeal from the Decree Entered May 30, 2019

J-S65027-19

in the Court of Common Pleas of Berks County,
Orphans' Court at No(s):  86417.

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and COLINS, J.*

MEMORANDUM BY KUNSELMAN, J.:                    **FILED JANUARY 13, 2020**

J.L.C. (Mother) appeals from the decrees entered by the Berks County Orphans' Court, which involuntarily terminated her parental rights to three of her children (four-year-daughter K.J.K, two-year-daughter E.J.K., and one-year-son W.P.J.K.) pursuant to the Adoption Act. [1] ***See*** 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).  Additionally, Mother's counsel has filed a petition to withdraw and a brief pursuant to ***Anders v. California***, 386 U.S. 738 (1967) and ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009). Upon review, we grant counsel's petition to withdraw and affirm the termination decrees.

The orphans' court summarize the factual and procedural history of this matter as follows:

> [Father] and [Mother] (collectively "Parents") are the natural parents of K.J.K. (born October [] 2014), E.J.K. (born January [] 2017) and W.P.[J.]K. (born January [] 2018) (collectively "the Children").  Mother and Father were not married when the Children were born.  Mother has three additional children who do not reside with her and Father has two additional children that do not reside with him.

---

* Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court also terminated the parental rights of J.K. (Father).  He filed a separate appeal, which is also before this panel.

- 2 -

Berks County Children and Youth Services ("BCCYS") first engaged Parents and Children ("the Family") in 2013, though services were discontinued when Parents moved into Montgomery County. In November of 2015, upon referral from BCCYS and the Family moving into Montgomery County, Montgomery County Children and Youth Services ("MCCYS") became involved in funding services and supervision of the case due to ongoing mental health, domestic violence and housing stability issues.

In 2017, upon referral from MCCYS indicating that the Family had moved back into Berks County, BCCYS was re-engaged with the Family in order to address ongoing issues with both Mother and Father. After several months within which several incidents and continuing issues prompted safety plans from BCCYS, but the safety plans were repeatedly broken. On October 12, 2017, BCCYS filed an emergency petition for custody of K.J.K. and E.J.K. that was granted by the court. BCCYS then filed a dependency petition for K.J.K. and E.J.K., and upon a hearing before this court, legal custody was transferred to BCCYS for placement purposes. The primary established goal was return of K.J.K. and E.J.K. to the most appropriate parent with a concurrent goal of adoption.

Mother gave birth to W.J.K. [i]n January [] 2018. After no reported prenatal care and both Mother and W.[P.]J.K. tested positive for methamphetamines, BCCYS filed a petition on March 13, 2018 seeking dependency of W.[P.]J.K. The court ordered that W.[P.]J.K. would remain with Parents as he was still hospitalized, but also ordered that foster parents were allowed to visit W.[P.]J.K. due to Parents' inconsistent visits. Upon his discharge from the hospital, BCCYS filed for emergency custody of W.[P.]J.K. and after a hearing, legal custody was transferred to BCCYS on March 28, 2018.

[***]

On October 31, 2018, [BCCYS] filed a petition for the involuntary termination of the parental rights of both Mother and Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). The petition cited the same following factual support for grounds for termination:

- 3 -

> a. Failure of Mother and Father to obtain and maintain a legal/stable source of income;
>
> b. Failure of Mother and Father to obtain and maintain stable and appropriate housing;
>
> c. Inability of Mother and Father to appropriately parent the Children;
>
> d. Failure of Mother and Father to show progress with parenting skills;
>
> e. Failure of Mother and Father to remediate substance abuse issues;
>
> f. Concerns remaining regarding Mother's and Father's mental health; and
>
> g. Concerns remaining regarding issues of domestic violence.
>
> A hearing on the petition was held on May 13, 2019 and continued for a second day on May 23, 2019.
>
> [***]
>
> Upon conclusion of the hearing, the court took the matter under advisement. Thereafter, [the court] filed separate orders dated May 30, 2019 terminating the parental rights of both Mother and Father as to K.J.K., E.J.K., and W.[P.]J.K.

Trial Court Opinion, 8/15/19, at 1-16 (citations to the record omitted).

Initially, we note that Mother's counsel filed an *Anders* brief and a petition to withdraw. Before reaching the merits of Mother's appeal, we must first address counsel's request to withdraw. *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Supr. 2005) ("'When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.'") (quoting *Commonwealth v. Smith*, 700 A.2d 1301, 1303 (Pa. Super. 1997)). "[T]his Court extended the

- 4 -

*Anders* principles to appeals involving the termination of parental rights." *In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014) (citation omitted). To withdraw pursuant to *Anders*, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citing *Commonwealth v. Lilley*, 978 A.2d 995, 997 (Pa. Super. 2009)). With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, an *Anders* brief must comply with the following requirements:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Santiago***, 978 A.2d at 361.

In the instant matter, counsel has filed a petition to withdraw, certifying that he has reviewed the case and determined that Mother's appeal is wholly frivolous. Counsel also has filed a brief that includes a summary of the history and facts of the case, issues raised by Mother, and counsel's assessment of why those issues are frivolous, with citations to relevant legal authority. Counsel has included in his brief a copy of his letter to Mother, advising her that she may obtain new counsel or raise additional issues pro se.

Accordingly, counsel has substantially complied with the requirements of ***Anders*** and ***Santiago***. ***See Commonwealth v. Reid***, 117 A.3d 777, 781 (Pa. Super. 2015) (observing that substantial compliance with the ***Anders*** requirements is sufficient). Therefore, we may proceed to review the issues outlined in the ***Anders*** brief. In addition, we must "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." ***Commonwealth v. Flowers***, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

Counsel's ***Anders*** brief lists the following in the section entitled statement of questions presented:

> 1. Did the [orphans' court] err by terminating [Mother's] parental rights because the evidence presented by [BCCYS] was insufficient to support the lower court's decision?

***Anders*** Brief at 4.

We are mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The petitioner must prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

When terminating parental rights under section 2511(a), this court has stated that the focus is on the parent; but under section 2511(b), the focus in

on the child.  *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances…where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are also a relevant part of this analysis. *See In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at

763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of … her child is converted, upon the failure to fulfill … her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

In the argument section of the brief, counsel presents three reasons that support Mother's appeal. First, counsel cites to the fact that Mother is the biological parent of the Children. The fact alone does not merit a reversal. "[T]he goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the children, but must be weighed in conjunction with other factors." *In re K.D.*, 144 A.3d 145, 153 (Pa. Super. 2016) (citing *In re Adoption of G.R.L.*, 26 A.3d 1124, 1127 (Pa. Super. 2011).

Second, counsel argues that Mother became substantially compliant with the supervised visiting protocol. The orphans' court found the opposite, that Mother repeatedly missed or cancelled visitation with the Children. *See* T.C.O. at 14, 15, 18, 19. This finding is supported by the record.

Third, counsel argues that Mother did receive treatment for "medical management and anxiety[.]" *See Anders* Brief at 5. The apparent inference is that Mother's ailments were legitimate. We do not question the legitimacy of Mother's struggle to maintain suitable mental health. However, that does

- 9 -

not excuse Mother from her duty to parent the Children. If anything, the question becomes whether Mother's mental health renders hers incapable of parenting, pursuant to 23 Pa.C.S.A. § 2511(a)(2). In any event, the orphans' court determined that Mother failed to treat her mental health in such a meaningful way that it would alleviate the concerns of BCCYS. While we conclude that this determination was supported by the record, we emphasize that Mother's mental instability was but one of several reasons that led to the Children's removal from her care. Mother could not remedy the other concerns either.

We have reviewed the certified record, the briefs of the parties, the applicable law, and the extremely thorough 20–page opinion of the Bucks County Orphans' Court. We conclude that the court's well-reasoned opinion accurately disposes of the issues relating to the parental rights termination issues presented on appeal and we discern no abuse of discretion or error of law. Accordingly, we adopt orphans' court opinion as our own and employ that discussion as part of our basis for affirming the decrees from which these appeals arose.

In sum, our independent review of Mother's claims does not persuade us that she is entitled to relief. Moreover, our review of the record does not reveal any non-frivolous issues overlooked by counsel. **See Flowers**, 113 A.3d at 1250. Therefore, we grant counsel's petition to withdraw, and affirm the orphans' court decrees.

Decrees affirmed. Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/13/2020

IN THE COURT OF COMMON PLEAS OF
BERKS COUNTY, PENNSYLVANIA
ORPHAN'S COURT DIVISION

| | |
|---|---|
| IN RE: K.J.K. | : INVOLUNTARY TERMINATION<br>: OF PARENTAL RIGHTS<br>:<br>: No. 86415<br>:<br>: SCOTT D. KELLER, S.J. |
| IN RE: E.J.K. | : INVOLUNTARY TERMINATION<br>: OF PARENTAL RIGHTS<br>:<br>: No. 86416<br>:<br>: SCOTT D. KELLER, S.J. |
| IN RE W.P.K. | : INVOLUNTARY TERMINATION<br>: OF PARENTAL RIGHTS<br>:<br>: No. 86417<br>:<br>: SCOTT D. KELLER, S.J. |

1925(a) Opinion                        August 15, 2019

Before the court are Appellants' Matters Complained of on Appeal. For the reasons set forth herein, we find that all alleged errors lack merit.

## FACTUAL BACKGROUND

J.K. ("Father") and J.C. ("Mother")(collectively "Parents") are the natural parents of K.J.K. (born October ● 2014), E.J.K. (born January ● 2017) and W.P.K. (born January ● 2018) (collectively "the Children"). Mother and Father were not married when the Children were born. Mother has three additional children who do not reside with her and Father has two additional children that do not reside with him.

Berks County Children and Youth Services ("BCCYS") first engaged Parents and Children ("the Family") in 2013, though services were discontinued when Parents moved into Montgomery County. In November of 2015, upon referral from BCCYS and the Family moving into Montgomery County, Montgomery County Children and Youth Services ("MCCYS") became involved in funding services and supervision of the case due to ongoing mental health, domestic violence and housing stability issues.

1

In 2017, upon referral from MCCYS indicating that the Family had moved back into Berks County, BCCYS was re-engaged with the Family in order to address ongoing issues with both Mother and Father. After several months within which several incidents and continuing issues prompted safety plans from BCCYS, but the safety plans were repeatedly broken. On October 12, 2017, BCCYS filed an emergency petition for custody of K.J.K. and E.J.K. that was granted by the court. BCCYS then filed a dependency petition for K.J.K. and E.J.K., and upon a hearing before this court, legal custody was transferred to BCCYS for placement purposes. The primary established goal was return of K.J.K. and E.J.K. to the most appropriate parent with a concurrent goal of adoption.

Mother gave birth to W.J.K. on January ● 2018. After no reported prenatal care and both Mother and W.J.K. tested positive for methamphetamines, BCCYS filed a petition on March 13, 2018 seeking dependency of W.J.K. The court ordered that W.J.K. would remain with Parents as he was still hospitalized, but also ordered that foster parents were allowed to visit W.J.K. due to Parents' inconsistent visits. Upon his discharge from the hospital, BCCYS filed for emergency custody of W.J.K. and after a hearing, legal custody was transferred to BCCYS on March 28, 2018.

## PROCEDURAL HISTORY

On October 31, 2018, Berks County Children and Youth Services ("BCCYS") filed a Petition for the Involuntary Termination of the Parental Rights of both Mother and Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5) & (8). The Petition cited the same following factual support for grounds for termination:

a. Failure of Mother and Father to obtain and maintain a legal/stable source of income;

b. Failure of Mother and Father to obtain and maintain stable and appropriate housing;

c. Inability of Mother and Father to appropriately parent the Children;

d. Failure of Mother and Father to show progress with parenting skills;

e. Failure of Mother and Father to remediate substance abuse issues;

f. Concerns remaining regarding Mother's and Father's mental health; and

g. Concerns remaining regarding issues of domestic violence.

A hearing on the petition was held on May 13, 2019 and continued for a second day on May 23, 2019.

2

At the hearing, Brenda Persun with MCCYS testified that she was the ongoing caseworker for the family from April of 2016 until July of 2017 when the family was evicted from their residence in Montgomery County. (N.T. 18-19). MCCYS first became involved with the family upon a referral from Berks County in November of 2015 regarding Mother's unaddressed issues with mental health, homelessness and domestic violence. (N.T. 20-21). The case was then transferred to Ms. Persun in the ongoing department because MCCYS intake determined that further services were necessary. (N.T. 21).

Ms. Persun attempted initial contact with Mother and was successful in eventually getting in touch with Mother to set up the home visit. *Id*. Ms. Persun began services for the Children and upon determining that more support may be needed, requested further services, including parenting skills and addressing domestic violence issues. *Id*.

In September of 2016, MCCYS received a report of domestic violence involving Mother. (N.T. 23-24). After the incident, MCCYS put a safety plan in place in which Mother was not permitted to be alone with K.J.K. (N.T. 24). On October 11, 2016, the safety plan was removed because the charges related to the incident were dropped and MCCYS determined that the incident was not against K.J.K. (N.T. 27). MCCYS implemented nurturing and parenting services, as well as couple's counseling for Parents. (N.T. 27). Parents complied with these services, but were not consistent with drug and alcohol and mental health treatment. (N.T. 27-28).

In May of 2017, Mother presented MCCYS with a urine sample that was tested and resulted positive for amphetamines. (N.T. 28). Following a retest to confirm the results, MCCYS then put a safety plan in place so that Mother would not be alone with K.J.K. due to the drug use. (N.T. 28). Father was also tested at that time, but the results were negative. *Id*. Therefore, Father was included as an individual in the safety plan who could supervise K.J.K. *Id*. As a result of Mother's positive screen, a new drug and alcohol worker was assigned, and an evaluation was performed on July 26, 2017. *Id*. However, Mother failed to disclose the use and therefore, no treatment was recommended. *Id*.

The Family resided at six different addresses while MCCYS was supervising. (N.T. 33). The Family was evicted from their home on July 27, 2017. (N.T. 29-30). Ms. Persun attempted to contact Parents after the Family had been evicted and detailed tracking Parents down through

3

different safety plan individuals, through two different hotels, through a place in Pottstown and until learning through maternal grandmother that the Family had relocated to Berks County. (N.T. 19).

On September 21, 2017, Ms. Persun met with the Family at the home of Daniel Crosby in Berks County, at which time the Family indicated their intention to remain in Barks County to find housing. (N.T. 33). At that same visit, Mother presented a urine screen to Ms. Persun that tested positive for methamphetamine. *Id.* Another safety plan was put in place for Father to be the safety support. *Id.* Ms. Persun likewise attempted to obtain a urine screen from Father, but he was unable to provide a sample, so arrangements were made to have Father visit the office the next day. (N.T. 33-34). Father did not appear. (N.T. 34). Because the family was now residing in Berks County, and issues involving domestic violence, family, housing and instability continued unresolved, Ms. Persun referred the case to Berks County. (N.T. 35). No petition for removal of the Children were ever filed while MCCYS were involved because Parents were compliant with safety plans that were put into place. (N.T. 41-42).

Kristin Perich from The Lincoln Center testified that she was assigned as an in-home support clinician with Mother and Father beginning in November of 2016 through July of 2017. (N.T. 57). Ms. Perich provided nurturing parenting program services and upon completion of the program, the case was transferred to another counselor within the agency for drug and alcohol concerns. (N.T. 57). Concerns regarding domestic violence and mental health prompted involvement, which included treatment goals of providing a more cohesive and nurturing environment for K.J.K. (who was the only child in the home at the time), as well as attempting to bring Parents into compliance with mental health treatment. (N.T. 58).

In the course of her initial visit with the Family, Ms. Perich observed a heated argument between Mother and Father and identified attention-seeking behavior exhibited by K.J.K. that was indicative of problems in the home environment. (N.T. 60-61). During the argument, Mother and Father admitted to daily physical violence occurring in the home. (N.T. 61). The argument between Parents continued and escalated prompting Ms. Perich to call law enforcement. (N.T. 60-61). By the time police responded, Mother had already left the residence and the police were able

4

to diffuse the situation inside the house and a plan was put into place where Mother would not return to the house that evening. (N.T. 61).

Ms. Perich testified that while she was supervising the family, she observed that a bond existed between Parents and K.J.K. and E. J.K., but could not testify as to any bond currently existing as Ms. Perich had not seen the children in over two years. (N.T. 79-80). In the beginning of Ms. Perich's involvement with the family, K.J.K. was a "wild child" who would often only be wearing a diaper, with unkempt hair and appeared dirty. (N.T. 81). Upon working with Mother through counseling, on later visits, K.J.K. appeared to be cleaner with her hair neatly kept. (N.T. 81). Ms. Perich did not observe any signs of physical abuse as to K.J.K. during her time working with the family. (N.T. 82).

Ms. Perich, upon conclusion of her involvement with the family, referred the case to OCY due to issues involving drug use, mental health, domestic violence, Mother's loss of custody of other children, as well as negative behaviors including sleeping all day, violence toward Father and leaving the Children unsupervised. (N.T. 85). Housing stability was also an issue. (N.T. 88).

Megan Miller, a case manager with Diakon Adoption and Foster Care, transported and supervised the Children's visits with Mother and Father from July of 2018 through the date of the hearing. (N.T. 90; 94). Ms. Miller testified that K.J.K. and E.J.K. would often be excited to see Mother and Father and would run over to them. *Id.* W.J.K. appeared not to understand the situation due to his age. *Id.*

Ms. Miller described her visits with the foster parents with whom the Children were staying and her observations thereof. (N.T. 90). W.J.K. and E.J.K. will go to either foster parent for comfort, while K.J.K. appears to favor foster mom for comfort. (N.T. 91). Both K.J.K. and E.J.K. refer to foster parents as mom and dad. (N.T. 92).

Foster parents have taken the Children to all medical and dental appointments. (N.T. 92-93). Mother and Father, though being made aware of scheduled appointments, attended only two dental appointments and one medical appointment of the four appointments scheduled for K.J.K. (N.T. 94). Mother and Father attended none of the nineteen medical appointments for W.J.K. or the four appointments for E.J.K. *Id.* Ms. Miller indicated that based upon her observations, she saw no detriment to the termination of the parental rights of Mother and Father as to the Children.

5

(N.T. 95). Moreover, Ms. Miller viewed the best interests of the Children as being served through the termination of the parental rights of Mother and Father. *Id.* While Ms. Miller recommended that K.J.K. be weened off of visits with Parents so as to lessen the overall impact, Ms. Miller opined that the Children are happy with foster parents and it would be harmful to remove them at this point. (N.T. 95-96).

Jennifer McFarland, a case manager with Open Door agency, testified that she became involved in this case in mid-July of 2018 and was still actively involved as of the date of the hearing. (N.T. 109). Ms. McFarland supervises visits between Mother and Father and the Children, which occurred twice weekly. (N.T. 110-11). Ms. McFarland reported that at first, Mother and Father struggled with being on time for visits, noting that father was late to forty-five visits while Mother was late to forty-seven. (N.T. 110). In January of 2019, the agency implemented a new visit policy requiring Mother and Father to arrive to the office one hour prior to the scheduled visit. (N.T. 111). The first visit thereafter was cancelled because Mother and Father were a half hour late and both Parents failed to show on one occasion. *Id.* However, since then, Mother and Father have been substantially complaint with arriving an hour before the scheduled visits. *Id.* Toward the end of January of 2019, at the request of Father, visits were held separately with Father having two hours once a week and Mother having two hours once a week. (N.T. 112).

Ms. McFarland testified that Parents bring appropriate food and drink items to the visits, along with sufficient activities for the Children. (N.T. 112). While Parents would initially make inappropriate comments, the behavior improved during the course of Ms. McFarland's supervision of the visits. (N.T. 114). Parents exhibited appropriate parenting skills as far as tending to the Children's basic needs, but disciplinary consistency has been an issue with which Mother and Father have struggled. (N.T. 115, 117). As far as the relationship between Mother and Father and the Children, Ms. McFarland noted that the relationship is loving and that both K.J.K. and E.J.K. exhibited excitement when coming to visits with Mother and Father, but Ms. McFarland also noted that the same is true between the Children and the foster parents. (N.T. 116).

Amber Haraschak, a family support worker with Child and Family First, who began providing casework services, parenting and supervised visits with Mother, Father and the Children

6

upon referral from Berks County Children and Youth in October of 2017. (N.T. 118-19). With Father, specific goals were set including a drug and alcohol evaluation and/or treatment, domestic violence evaluation and/or treatment, as well as continual employment and housing monitoring. (N.T. 119). Ms. Haraschak noted that Father's compliance with the goals was sporadic and inconsistent during the tenure of her supervision between October of 2017 and July of 2018. (N.T. 119-20). When Father indicated that he was unable to attend the sessions because he was working, so scheduling efforts were made to coordinate sessions on Father's days off, but Father's attendance and/or participation continued to be sporadic. (N.T. 120-21). In October of 2018, sessions were reduced due in part to lack of compliance, as well as because Father and Mother were no longer presenting together. (N.T. 121). Since January of 2019, Father's attendance and participation continued to be erratic, with Father only attending three sessions, not showing up for one session and repeated attempts from Ms. Haraschak to schedule further sessions, after which Father was discharged for non-compliance. (N.T. 122).

Mother's goals included mental health, domestic violence evaluation and/or treatment, drug and alcohol evaluation and/or treatment, as well as continued monitoring of housing and employment. (N.T. 125). Mother's compliance has likewise been sporadic with periods of consistency interrupted by gaps where Mother is absent, and Ms. Haraschak makes attempts to contact Mother to no avail. (N.T. 125-26).

Housing has been inconsistent with the Family living in Exeter in October of 2017, and then moving through Pottstown, two different locations in Birdsboro and then to an address that Parents did not release to the agency. (N.T. 127). Mother was then at a Reading address, and then to a Collegeville address and finally to Opportunity House in Reading where she resided at the time of the hearing. *Id.* Father only had the two Birdsboro addresses listed. (N.T. 127-28).

Ms. Haraschak noted that she still had concerns regarding Parents apparent ability to provide safe and appropriate care for the Children. (N.T. 129). Instability in housing, in the relationship between Mother and Father and compliance with established goals form the basis of Ms. Haraschak's concerns. (N.T. 129-30). Ms. Haraschak did not recall Mother giving a positive urine screen and indicated that Mother never appeared to be under the influence during her

7

interactions. (N.T. 130). The same could not be said of Father, who Ms. Haraschak reported gave a positive urine screen recently and was informed of steps to take, but failed to follow through. *Id*.

Mother never presented any proof of employment or income to Ms. Haraschak during her supervision. (N.T. 131). During her supervision, Ms. Haraschak discussed employment with Mother, but Mother complained that too many appointments and being too stressed out prevented her from finding employment. (N.T. 140). Meanwhile, Father, through presenting several documents indicating employment, he has been inconsistent documentation of stable employment. (N.T. 131-32).

Mother and Father complained to Ms. Haraschak about not receiving notices of the Children's medical appointments. (N.T. 141-42). Ms. Haraschak encouraged Parents to reach out to her supervisor and to Parents' BCCYS caseworker in order to receive such notices. (N.T 142).

Steven Henshaw, a clinician with Commonwealth Clinical Group (CCG) who was likewise qualified as such, testified that he had been treating Father from February of 2018 and meeting weekly with Father until November of 2018 when Father was discharged from treatment. (N.T. 148-49). Mr. Henshaw stated that Father was discharged due to attendance issues for missing too many appointments. (N.T. 149). The treatment plan for Father through CCG included goals of having Father recognize and take responsibility for past and current domestic violence issues, as well as identifying causes and specific manifestations of domestic violence. (N.T. 155). While in treatment with CCG, Father disclosed that he had separated from Mother due to Mother's erratic behavior, which he described as unstable. (N.T. 150-51). Father also indicated that as it applied to the BCCYS involvement, "he would have a better chance without [Mother] than with her." (N.T. 151). After having moved in with his paramour shortly after separating with Mother, Father complained that Mother was stalking him both physically and electronically over the internet. (N.T. 152). Mr. Henshaw stated that Father's treatment was beginning to progress, but that attendance dropped off and Father was only superficially completing assignments. (N.T. 153). Furthermore, Mr. Henshaw testified that Father had not addressed issues of substance abuse or housing stability at the time he was discharged. *Id*.

Dr. Richard Small, who was qualified as an expert in the field of psychology, testified that that he performed forensic evaluations of both Father and Mother. (N.T. 161). Dr. Small's

8

evaluation of Father performed in March of 2018 and Father presented as exhibiting self-centered and anti-social behavior. (N.T. 162). Dr. Small noted that Father's relationship with Mother included verbal and physical violence, including a PFA, and that the relationship between the two was difficult. *Id.* Father admitted no issues and indicated that any problems were the fault of other people without accepting any responsibility on his own. (N.T. 163).

In relation to Father's prospect of change, Dr. Small opined that he sees Father's prospect of change as "not very good," due to Father's personality disorder and because Father maintains that he has done nothing wrong and viewing himself as superior to others. (N.T. 163-64). Initially, Father refused to admit any drug use, but then slowly provided further details on his drug use. (N.T. 165). When Dr. Small asked how Father could maintain clean urine samples, Father indicated that he knew how to game the system. *Id.* Further, Father demonstrated no view of problematic drug use other than perhaps the legal consequences arising therefrom. *Id.*

Mother denied any substance abuse issues with Dr. Small, claiming that the only time she did use was when she thereafter produced a dirty urine sample. (N.T. 166). Dr. Small indicated Mother as having an anxiety disorder, a borderline personality disorder and an intermittent explosive disorder. *Id.* Mother mentioned that there had been some domestic abuse issues, but did not seem too concerned about the issue. *Id.* Dr. Small testified that Mother did not take personal responsibility for her actions and that Mother's prospect for change were not good though Dr. Small viewed it as better than Father. (N.T. 166-67).

Dr. Small opined that he had great concern regarding the combustible relationship between Father and Mother and the negative effect on the needs of the Children. (N.T. 167). Dr. Small further indicated that it is common to observe intermittent periods of engagement with individuals in which it appears that the individuals are cooperating and recognizing issues, but then the progress falls apart. (N.T. 168). When it came to the Children, Dr. Small noted that Father spoke about the Children with affection, while Mother was much more focused on herself without much mention of the Children. (N.T. 181). However, Dr. Small concluded that he had strong doubts as to whether Father or Mother could provide a consistent safe, nurturing and stable environment for the Children. (N.T. 182).

9

Andrea Karlunas with CCG, who was qualified as an expert in domestic violence and mental health counseling, testified that she initially received a referral from BCCYS regarding Mother and so began treatment with Mother in February of 2018 and lasting until Mother's discharge from treatment in January of 2019. (N.T. 184-85). Ms. Karlunas stated that treatment with Mother was inconsistent first because Mother did not transfer insurance in a timely fashion, and then because Mother requested that Ms. Karlunas be removed from the case, which request was denied. (N.T. 185).

The treatment goal for Mother were to address the issue of domestic violence through identification of potential triggers, recognizing characteristics of abuse and identifying mental health factors that could be intermingled. (N.T. 186). Ms. Karlunas identified substance abuse issues along with depression and anxiety that would be addressed through building coping skills, learning to reduce risk factors in the relationship and develop independent skills while addressing the effects of everything on the Children. (N.T. 186-87).

Unfortunately, Ms. Karlunas reported that little to limited progress was made in Mother's treatment. (N.T. 187). Specifically, Mother denied any substance abuse issues, would become defensive and argumentative and global instability was still a consistent problem. (N.T. 187-88). Mother likewise denied that the Children had ever been exposed to or witnessed domestic violence and therefore, she denied any adverse or negative effect of such domestic abuse on the Children. (N.T. 189). Moreover, Mother's issues with housing, finances, her relationship with Father, mental health and substance abuse within the relationship were not remediated at the time of Mother's discharge from treatment. (N.T. 188). Finally, Ms. Karlunas concluded that Mother continued to exhibit instability and the factors that first brought the Children under the care of CYS continued upon Mother's discharge from treatment. (N.T. 191).

Mother testified that she was last employed in November of 2016 and that she no longer works due to lower back issues. (N.T. 201). At the time of the hearing, Mother was awaiting disposition of her application for disability assistance through social security. *Id.* At the time of the hearing, she was receiving $205 a month through social security, but expected to receive significantly more upon approval of disability. (N.T. 228). However, Mother did not know when a hearing on the disability application would occur or whether she would actually be approved for

10

disability supplemental receipt. (N.T. 238). Mother had previously working in the nursing field for about seven or eight years. *Id.*

At the time of the hearing, Mother was living in transitional housing through Berks Counseling Center. (N.T. 234). Mother was in treatment for mental health issues through Horizonz from October of 2018, and prior to that, she was in treatment with Creative Health Services. (N.T. 202). Mother has been engaged in treatment with Dr. Janjua since 2012 for medication management and taking sessions with one of the therapists in Dr. Janjua's office. (N.T. ___; 230-31). Mother also stated that her current mental health issues all stemmed from anxiety due to problems with caseworkers and the Children being removed from her care. (N.T. 231

Mother stated that she was not aware of court-ordered drug screens and that is the reason she missed forty-eight screens, but claims that since becoming aware, she started attending again, though she claims the distance to attend is a problem. (N.T. 206-07). Mother was aware that she was court ordered to attend domestic violence treatment, but had not completed because she had not found a treatment center that will accept her. (N.T. 207-08). She claimed that she requested information from several different caseworkers to assist in locating a provider for domestic violence treatment, and was only referred to CCG. (N.T. 229).

Mother claims that she refused to see Ms. Karlunas at CCG because she disagreed with Ms. Karlunas' diagnosis. (N.T. 210). Mother further claimed that treatment for domestic violence issues occurred in Montgomery County and that no further reports of domestic violence have been filed since that time. (N.T. 210-11). Mother maintained that traffic and issues in transportation caused her to be late to forty-seven of the visits with the Children. (N.T. 218-20). As for the failures to show at visits, Mother asserts that she was hospitalized for a period of time and that other times, she would show up a few minutes late and would then be denied the visit. (N.T. 221-22). Mother insists that she has been sober since September of 2017

Mother has three children separate from those that are the subject of this matter who do not live with Mother. (N.T. 201-02). Mother believes that she is able to properly care for the Children and claims that she "had to let the other three [children] go to prevent them from being in the system as well." (N.T. 226). Mother testified that parenting issues were never addressed at the supervised visits and none of the supervising caseworkers indicated that parenting was a concern.

11

(N.T. 227). Mother stated that BCCYS set up a safety plan and then came two weeks later and removed the Children without providing any information or services in order to prevent the removal. (N.T. 234).

Father testified that he was currently living with a friend after having spent time at the Hope Rescue Mission. (N.T. 256-57). Father admitted that he does not have stable housing at the time of the hearing. (N.T. 262). Father had recently attained employment through Install America approximately a week prior to the hearing. (N.T. 256-57).

Father admitted that he received the court order indicated the services he needed to engage including mental health, domestic violence and drug and alcohol treatment. (N.T. 258). Father admitted that he did not consistently attend urine screens, but claimed that he couldn't attend due to cost and time issues. (N.T. 258-59). Father also admitted that he had not completed the required domestic violence treatment because he was discharged and claimed that he was late to meetings because of traffic and parking issues. (N.T. 262).

Marsha Ganter, a permanency and adoption supervisor with the BCCYS, testified that this case had been active between Berks and Montgomery counties since June of 2015, with BCCYS involvement re-engaging in October of 2017 because Parents relocated back into the County. (N.T. 282-83). BCCYS filed an emergency petition for placement of the Children into foster care. (N.T. 283). When Ms. Ganter received referral to her department, the case was being serviced by Ms. Haraschak with Child and Family First and visitation with Parents was set through Open Door. *Id.* Ms. Ganter then proceeded with referrals for other services required through the court orders. (N.T. 283-84). Ms. Ganter, along with the caseworker, then met with Mother and Father to review the court orders so that Mother and Father knew exactly what services were required and what steps they needed to take. (N.T. 284).

As Ms. Haraschak was the primary caseworker, she initiated weekly visits with Parents beginning on October 12, 2017. *Id.* Parents were inconsistently compliant in meeting with Ms. Haraschak with Mother and Father each only attending one of fifteen sessions. (N.T. 285-86). Compliance did improve, but was not sustained as Mother attended ten of the twelve sessions int eh next reporting period and Father only attended five out of the twelve sessions. (N.T. 287). In the next reporting period from April through July of 2018, Mother attended eleven sessions while

12

Father was incarcerated for some of the time, but failed to show after his release. *Id.* In the reporting period from July through October of 2018, Mother attended six out of twelve sessions and Father attended five. (N.T. 288).

Due to Parents' inconsistent cooperation, Ms. Ganter adjusted the schedule so that services were offered biweekly to each Parent separately because they were no longer in a joint relationship. *Id.* Mother then only attended three of seven sessions and Father attended four out of five. (N.T. 289). Father was unsuccessfully discharged as he discontinued services with Ms. Haraschak. *Id.* BCCYS offered supplemental services to Parents directly approximately twenty-one times, but only Mother engaged BCCYS regarding those supplemental services and such was only via telephone. (N.T. 289).

At the time that BCCYS received the referral on the case back into Berks County, Mother was not engaged in mental health services, so BCCYS discussed with Mother and she thereafter attended an intake with Creative Health Services in January of 2018. (N.T. 290-91). Shortly after W.J.K. was born testing positive with amphetamines in his system, Mother was likewise accepted for drug and alcohol services as well, which she completed in July of 2018. (N.T. 291). Mother requested that mental health services be consolidated through CCG and BCCYS agreed. *Id.* Because Mother still had her public assistance benefits through Montgomery County, BCCYS agreed to provide funding for Mother's treatment through CCG for thirty days to allow Mother enough time to transfer assistance to Berks County. *Id.* Unfortunately, Mother did not arrange for the public assistance benefits to transfer within the thirty-day period and so there was some delay in treatment, but the issue was eventually resolved. (N.T. 292). Ultimately, Mother was receiving mental health, medication management, domestic violence and anger management services through CCG. *Id.*

After completing her drug and alcohol treatment in July of 2018, Mother took issue continuing treatment with Ms. Karlunas and the issue then went before the court, which, after a two-day hearing, ordered that Mother continue treatment with CCG. (N.T. 292-93). Upon resuming treatment, Mother's attendance was inconsistent, and she was subsequently discharged in January of 2019 for noncompliance. (N.T. 293). Likewise, Mother was unsuccessfully discharged from domestic violence treatment. (N.T. 300). Given the status of the four-year

13

involvement and the progression of the case, BCCYS expected Mother to seek out alternative treatment providers on her own without the agency prompting the issue. (N.T. 293-94). Thereafter, Mother engaged with Horizonz for her mental health treatment, upon which her attendance has included one intake session and four individual sessions. (N.T. 294-95). BCCYS concluded that Mother's mental health and domestic violence concerns had not been sufficiently addressed and remain unresolved. (N.T. 295-96).

Initially, in accordance with court-ordered service, Mother was set up for twice weekly random urine screens. (N.T. 300). In April of 2018, having submitted consistently clean urine samples, Mother's screens were reduced to once every other week. *Id.* Mother's compliance faltered through the fall and she missed forty-eight screens. (N.T. 300-01). Upon resumption of compliance in February of 2019, Mother continued to submit negative urine samples. (N.T. 301).

Ms. Ganter indicated that Father reported, some time after October of 2018, that Mother was stalking him along with various other allegations that he shared with multiple individuals. (N.T. 299). Father also requested that Parents' visitation occur separately. *Id.*

Although Father was eligible to receive as early as January of 2018, but did not begin to attend treatment until May of 2018. (N.T. 302). Father did not comply with urine screens until September of 2018, after the court ordered screening. *Id.* On September 21, 2018, Father tested positive for methamphetamine and was subsequently informed that he needed to contest the results or, in lack thereof, return for a drug and alcohol evaluation. (N.T. 302). Father did not comply with the evaluation until the day after the termination petition was filed. *Id.* Father has also not been consistent as to his own self-reported drug use. (N.T. 303-04). Furthermore, Father has not completed any drug and alcohol treatment plan since the Children were placed. (N.T. 304).

After issues with Parents arriving late for visitation appointments, BCCYS implemented, and the court later ordered, the Parents arrive one hour prior to the visitation appointments. (N.T. 305-06). As was noted, both Parents missed or cancelled appointments throughout. (N.T. 306). When Father requested separate visitation times, visitation was reduced from twice a week for two hours with both Parents to once a week for two hours with Mother and the same with Father. *Id.*

Ms. Ganter noted that K.J.K. demonstrated no negative effects resulting from the reduction in visitation time. (N.T. 306-07). K.J.K. does not ask for Parents while at the home of foster

14

parents between visitation periods and there is no indication of effect or statements from K.J.K. when Parents have cancelled or failed to show up for visitation appointments. (N.T. 307).

Ms. Ganter described the interactions between the Children and the foster parents, which she has observed on approximately six or seven occasions, equivalent with her observation of visitations with Parents. (N.T. 308). W.J.K., one year old at the time of the hearing, was removed as a baby and his primary attached is to the foster parents. *Id.* E.J.K. also demonstrates a healthy attachment to the foster parents who provide emotional security and stability. *Id.*

While W.J.K. was in the hospital following his birth, Parents were not visiting consistently, therefore, the neonatologist requested someone to visit in the absence of Parents to learn his care. (N.T. 310). Upon request of BCCYS, the court granted the foster parents to visit W.J.K. in the hospital and he was subsequently discharged into the foster parents' care. *Id.* Despite Mother's claim that she received prenatal care with W.J.K. through Planned Parenthood, BCCYS never received any records to substantiate the claim. (N.T. 311). W.J.K. is still in the same foster home that he was placed in upon discharge from the hospital. *Id.* K.J.K. and E.J.K. were originally placed in short-term care. *Id.* The transition of K.J.K. and E.J.K. into the same foster home as W.J.K. was delayed until they could have updated immunizations. (N.T. 311-12).

Ms. Ganter indicated that she saw no detriment to the Children in terminating parental rights. (N.T. 313). W.J.K. has been in the care of the foster parents since shortly after his birth and is primarily attached to the foster parents. *Id.* E.J.K. has formed a secure attachment to the foster parents, seeking and receiving comfort, support and fulfillment of her needs. *Id.* K.J.K. has expressed that she didn't want to go back to the foster home or daycare following some visits, but she is easily redirected and is responsive to the comfort. (N.T. 309). K.J.K. refers to foster parents as mom and dad. (N.T. 314).

Ms. Ganter explained that BCCYS is seeking termination of parental rights due to the age and vulnerability of the Children, the length of time within which Parents have been afforded the opportunity to engage in services, the span of the case across two counties and the lack of progress and consistency from Parents. (N.T. 318). The needs of the Children for stability in living arrangements and in environment and the need for consistent and stable caregiving demonstrate that termination of parental rights is in the best interests of the Children. (N.T. 318-19).

15

Carman Stanziola, Esq., appointed as legal counsel for the Children ("Legal Counsel"), testified that he had the opportunity to meet with foster parents and with the Children. (N.T. 351). Legal Counsel observed the foster parents to engaging, caring and attentive to the needs of the Children and indicated that the foster parents share an attachment with the Children. *Id.* Since E.J.K. and W.J.K. were too young to engage in dialogue with Legal Counsel, he had a conversation with K.J.K. (N.T. 351-52). K.J.K. told Legal Counsel that she loves the foster parents, but indicated to Legal Counsel that she wanted to live with "old mommy and daddy," meaning Parents. (N.T. 352).

Sharon Scullin, Esq., appointed as Guardian ad Litem for the Children ("the GAL"), testified that in reviewing the reports, it is reported that K.J.K., though crying when she needed to leave visits with Parents, also cried when she was dropped off by the foster mom. N.T. 352-53). K.J.K. loves both Parents and foster parents. (N.T. 353). K.J.K. did not indicate to the GAL a preference of where she wanted to live. *Id.* The GAL observed a strong bond between K.J.K and the foster parents and noted the stability that foster parents offer in relation to the lack of stability K.J.K. had experienced with Parents. (N.T. 354). The GAL also expressed the importance of keeping K.J.K. with her siblings. *Id.* The GAL concluded that it is in the best interests of the Children to terminate the parental rights of both Mother and Father, indicating that the bond with the foster parents is healthier and much more critical than that with Parents. *Id.*

Upon conclusion of the hearing, the court took the matter under advisement. Thereafter, we filed separate orders dated May 30, 2019 terminating the parental rights of both Mother and Father as to K.J.K., E.J.K. and W.J.K.

Mother, through counsel, filed a Notice of Appeal as to all three children on June 26, 2019 and concomitantly filed her Concise Statement. In her Concise Statement of Matters Complained of on Appeal, Mother alleges the following errors:

A. The trial court erred in involuntarily terminating the Mother's parental rights pursuant to 23 Pa.C.S.A. [§] 2511(b) where the Mother had consistently visited her children and there was a bond between the Mother and Children and the termination of parental rights would have a negative effect on the developmental, physical and emotional needs of the [C]hildren.

16

B. The trial court erred in involuntarily terminating the Mother's parental rights pursuant to 23 Pa.C.S.A. [§] 2511(a)(1), (2), (5) and (8), where it was not supported by clear and convincing evidence when the Mother completed a substantial portion of her FSP goals.

(Appellant – Mother's Concise Stmnt.)(unnecessary capitalization removed).

We file this opinion pursuant to Pa.R.A.P. 1925(a).

## DISCUSSION

The Superior Court has set forth the standard of appellate review from an order involuntarily terminating parental rights as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of W.J.R.*, 952 A.2d 680, 683 (Pa.Super. 2008). Furthermore,

> Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re J.T.M.*, 193 A.3d 403, 408 (Pa.Super. 2018)(citation omitted). "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994). Additionally, "[t]he Orphans' Court is free to believe all, part, or none of the evidence presented and is likewise free

17

to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004). We need only find that the burden of proof has been satisfied as to any one subsection of Section 2511(a) in order to move to the second prong of our analysis. *See* Involuntary Termination of Mother's Parental Rights

Mother sets forth two separate issues upon appeal. Mother first argues that this court erred in involuntarily terminating the Mother's parental rights where the Mother had consistently visited her children and there was a bond between the Mother and Children and the termination of parental rights would have a negative effect on the developmental, physical and emotional needs of the Children.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005), [the Superior] Court stated. "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re B.J.Z.*, 207 A.3d 914, 921–22 (Pa.Super. 2019). Therefore, in the court's consideration of whether termination of parental rights will serve the best interests of the Children, we must "take into account whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Adoption of K.J.*, 936 A.2d 1128, 1134 (Pa.Super. 2007). However, "[a]bove all else the court must give adequate consideration to the needs and welfare of the child." *Id.*

We disagree with Mother's contention that she consistently visited the Children as the testimony and evidence clearly demonstrates that Mother repeatedly missed or cancelled visitation session with the Children that were arranged. Likewise, while W.J.K. was in the hospital. Mother failed to visit regularly in order to learn techniques that were necessary for proper care of W.J.K. given his fragile condition at the time.

18

Mother claims that severing the parental bond between herself and the Children would result in a negative effect on the Children's developmental, physical and emotional needs. Again, we find this assertion to be erroneous. The testimony and evidence demonstrated that the Children have bonded strongly with the foster parents and the Children's needs for stability, love, security and comfort are amply provided in the foster parents' home. While some testimony indicated that K.J.K. may need some process by which to transition, there is no evidence that the termination of the parental bond would have such a negative effect on the Children. E.J.K. and W.J.K. are younger and, having formed the strong bond with the foster parents, show no signs that severing the parental bond would prove detrimental. The Children are now in a stable environment where they receive healthy support and comfort and providing fulfillment for their physical and emotional needs. Likewise, an important factor is keeping K.J.K. with her siblings to nurture the sibling bond. Therefore, we find that Mother's alleged error lacks merit.

Mother also contends that this court erred in involuntarily terminating the Mother's parental rights where it was not supported by clear and convincing evidence when the Mother completed a substantial portion of her FSP goals. Mother challenges the court's discretion and role as a fact finder in our determination of the issue.

The testimony and evidence presented at the hearing clearly demonstrates that Mother repeatedly failed to fulfill or complete the established goals. Ms. Ganter testified that Mother's continuing issues with mental health treatment and domestic violence remained unresolved. Mother's housing situation remained unstable. Mother failed to regularly attend the Children's medical and dental appointments and repeatedly failed to show or canceled visitation session with the Children. Mother consistently minimized identified issues, including domestic abuse concerns and drug use and little progress was reported through treatment and services provided.

As the Superior Court has stated: "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities[, and that t]he court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re G.M.S.*, 193 A.3d 395, 402–03 (Pa.Super. 2018). The same is true here. Mother's inconsistent compliance with treatment and services goals demonstrates that it is unlikely that any resolution of the underlying issues will be manifest in a

19

reasonable time. Consequently, we find it in the best interests and welfare of the Children to terminate Mother's parental rights.

Having addressed the alleged errors, we find that none have merit. Accordingly, we submit these matters to the Superior Court for review and urge the Court to affirm our decrees thereupon.

20